UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| NICE GLASS LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 4:18-cv-01835-NCC |
| COLL FINANCIAL HOLDINGS, LLC | ) |
| d/b/a C2 FIBERS LLC; BRIAN COLL; | ) |
| and RENEE COLL, | ) |
| | ) |
| Defendants. | ) |

## FIRST AMENDED COMPLAINT

NICE Glass LLC ("NICE Glass"), by and through the undersigned counsel and pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, hereby files its First Amended Complaint against Defendants Coll Financial Holdings LLC d/b/a C2 Fibers LLC ("CFH"), Brian Coll, and Renee Coll, referred to collectively herein as the "Colls."

## PRELIMINARY STATEMENT

1. This is a contractual dispute in which plaintiff NICE Glass purchased the assets of a company that Defendants represented was a viable, perfected, and production-ready process for making railroad ties out of waste fiberglass and plastic waste materials. Defendants represented as true and warranted that the Invention (and related processes) were commercially ready. It has become clear that NICE Glass purchased an unproven and unfeasible concept, rather than the production-ready process/business that the Seller Parties represented and warranted. NICE Glass made a significant investment in capital, time, and energy only to find profound lack of alignment between what Seller Parties described to NICE Glass in the parties' Asset Purchase Agreement ("APA") and what NICE Glass actually received. At significant time and financial cost, and without the full cooperation of the Defendant, NICE Glass has spent significant time

and money trying to get the Invention to work, but to no avail. Defendants did not have the process knowledge they represented with relation to the Invention and/or the Business sold. Nor did Defendants document the process as they worked to develop the Invention, and thus Defendants have been unable to provide any useful guidance on trying to get the Invention to work. NICE Glass has found several other significant discrepancies between what the Defendants represented and what is in fact true in making railroad ties. This action seeks to enforce the representations and warranties made in the APA through either an award of compensatory damages for the representations' and warranties' falsity and breach (respectively) or by rescinding the APA and all related agreements based upon Defendants' material breach thereof. This action also seeks a judicial declaration that NICE Glass is excused of its continuing contractual obligation to pay royalties under the APA because of Defendants' material breaches thereof.

## PARTIES, JURISDICTION & VENUE

2. Plaintiff NICE Glass is a limited liability company whose members are Tim Noonan, Matt Moore, and Re-Poly, LLC. Re-Poly, LLC's members are Greg Janson, Matt Janson, Dave Bellon, and Enrico Siewert. Noonan, Moore, Greg Janson, Matt Janson, Bellon, and Siewert are U.S. citizens domiciled in the State of Missouri.

3. Defendant CFH is a limited liability company. Its members are co-defendants Brian and Renee Coll, U.S. citizens domiciled in Ohio.

4. The Court has original jurisdiction under 28 U.S.C. § 1332(a) because no plaintiff and defendant is a citizen of the same State and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5. By agreement of the parties, personal jurisdiction and venue are proper in this Court (pursuant to Section 7.11 of the APA dated June 16, 2017 between NICE Glass, CFH, Brian Coll and Renee Coll for the purchase of certain assets (the "APA," a true and accurate copy of which is attached hereto as Exhibit A)).

6. In addition, venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

7. In addition, Defendants have waived any challenge to personal jurisdiction or venue in this judicial district by not challenging them in their Motion to Dismiss Plaintiff's Complaint, filed November 2, 2018. *See* Fed. R. Civ. P. 12(h)(1).

## **FACTS COMMON TO ALL CLAIMS**

8. This lawsuit involves several contracts between the parties, including the following:

   (a) the APA;

   (b) a related Bill of Sale dated June 16, 2017 between CFH and NICE Glass;

   (c) a related Assignment and Assumption Agreement dated June 16, 2017;

   (d) a related assignment of intellectual property dated June 16, 2017;

   (e) a related Non-Competition and Non-Solicitation Agreement dated June 16, 2017 between NICE Glass and CFH;

   (f) a related Non-Competition and Non-Solicitation Agreement dated June 16, 2017 between NICE Glass and Brian Coll;

   (g) a related Non-Competition and Non-Solicitation Agreement dated June 16, 2017 between NICE Glass and Renee Coll;

   (h) a related Assignment and Assumption Agreement dated June 16, 2017 between NICE Glass, CFH, and Tim Noonan regarding a contract between voestalpine Nortrak, Inc. and the Seller Parties;

   (i) a related Assignment Agreement dated June 8, 2017 between CFH and NICE Glass regarding a contract between Owens Corning and CFH.

These agreements are collectively referred to herein as the "Agreements," and all capitalized terms not defined herein shall have the same meaning as in the APA.

9. The primary agreement among the parties is the APA, which refers to CFH as the "Seller," Brian and Renee Coll as the "Equity Holders," and the Seller and Equity Holders collectively as the "Seller Parties." The parties entered into the APA on June 16, 2017.

10. According to the APA, CFH "invented a process for converting glass waste such as but not limited to basement cullet, rovings, veil and mat and plastic waste materials into structural reinforced plastics (the 'Invention')." APA, Recitals.

11. CFH claimed to have used that Invention "in the business of manufacturing, selling, and distributing products used in the composite reinforcement industry, including but not limited to railroad ties, in each case created using a composite blend of recycled plastic and glass waste that incorporates, is based on, or is related to the Invention (the 'Business')." APA, Recitals.

12. CFH, the Colls, and NICE Glass entered into the APA to memorialize and govern NICE Glass's purchase from CFH of "the rights and obligations of Seller to the Invention and certain assets and liabilities relating to the Business, subject to the terms and conditions set forth" in the APA. APA, Recitals.

13. The specific assets that NICE Glass purchased from CFH (the "Purchased Assets") are identified in Section 1.01 of the APA's Disclosure Schedules and include the following items:

- Glass Chopping Line – 2 Finn and Frame Model choppers (no Serial #)
- Wash line (no serial #)
- Owens Corning Contract dated May 8, 2017
- Voestalpine Nortrak [Contract] dated May 15, 2017

- All Intellectual Property consisting of the process and technology involving using waste glass and blending it with recycled olefins to make structural products including:
    - Binders
    - Process Equipment
    - Proprietary Manufacturing Systems

14. The Seller Parties demanded and accepted a $70,000 prepayment from Nortrak pursuant to the Nortrak Contract, and then purported to assign the Nortrak Contract (and all related rights) to NICE Glass, yet has refused to transfer the prepayment funds to NICE Glass, despite multiple requests, in breach of the APA.

15. In Article III of the APA, CFH and the Colls, collectively as the "Seller Parties," made specific representations and warranties to NICE Glass regarding the Invention and the Business. They represented that all statements made in Article III were "true and correct."

16. In particular, in § 3.04 of the APA, the Seller Parties represented as true and warranted that the assets sold were sufficient for the continued conduct of the Business, including feedstock inventory for glass and plastic. Specifically, they represented as true and warranted (with emphasis added) as follows:

> The Purchased Assets are in good condition and are adequate for the uses to which they are being put, and none of such Purchased Assets are in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost. The *Purchased Assets are sufficient for the continued conduct of the Business* after the Closing *in substantially the same manner as conducted prior to the Closing* and constitute all of the rights, properties and assets necessary to conduct the Business as currently conducted. All inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories included in the Purchased Assets consist of a quality and quantity usable and salable in the ordinary course of business.

5

17. This representation was inaccurate and the Seller Parties breached this warranty because the Purchased Assets are *not* sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing.

18. In § 3.05 of the APA, the Seller Parties represented as true and warranted (with emphasis added) as follows:

> Since December 31, 2016, (a) *Seller has conducted the Business in the ordinary course consistent with past practice*, (b) there has not been any event, change, circumstance, occurrence, effect, state of facts or development that, individually or in the aggregate, has had or could reasonably be anticipated to have a material adverse effect on the operations of the Business, (c) neither the Business nor the Purchased Assets have suffered any loss, damage, destruction or other casualty affecting any material properties or assets thereof or included therein, whether or not covered by insurance, and (d) Seller has not taken any action that, if taken after the date of this Agreement, would constitute a breach of any of the covenants set forth in ARTICLE V.

19. This representation was inaccurate and the Seller Parties breached this warranty because CFH has *not* conducted the Business in the ordinary course consistent with past practice, including because CFH has never conducted the Business.

20. This representation was inaccurate and the Seller Parties breached this warranty also because there *has been* a "state of facts" that has had a material adverse effect on the operations of the Business, specifically that the Invention does not work and that CFH has never operated the Business.

21. In § 3.06 of the APA, the Seller Parties further represented as true and warranted that the intellectual property transferred in the APA, as listed in the Disclosure Schedules, included "all Intellectual Property consisting of the process and technology involving using waste glass and blending it with recycled olefins to make structural products," as well as:

> (iv) all "trade secrets, know-how, inventions, methods, processes and processing instructions, technical data, software, computer code, specifications, research and development information, technology

6

(including rights and licenses), business plans, forecasts, product roadmaps, customer lists and any other information, in each case to the extent any of the foregoing derives economic value (actual or potential) from not being generally known to other persons of entities who can obtain economic value from its discourse or use . . . (collectively, **"Trade Secrets"**); and (v) moral rights, publicity rights, data base rights and any other proprietary or intellectual property rights of any kind or nature that do not comprise or are not protected by Marks, Patents, Copyrights or Trade Secrets.

22. This representation was inaccurate and the Seller Parties breached this warranty. The Intellectual Property transferred in the APA did *not* include the process and technology involving using waste glass and blending it with recycled olefins to make structural products.

23. In § 306(g) of the APA, CFH further promised to "communicate to Buyer, its successors and assigns, or their representatives or agents, all facts and information known or available to Seller respecting the Invention, improvements, and modifications . . . whenever requested by Buyer."

24. CFH has not communicated to NICE Glass all facts and information known or available to CFH respecting the Invention, improvements, and modifications whenever requested by the Buyer, despite multiple requests for it from Buyer, and thus CFH has not fulfilled this promise.

25. In § 3.16 of the APA, the Seller Parties represented as true and warranted that they had not failed to disclose anything material regarding the Invention or Assets, specifically as follows:

> No representation or warranty by a Seller Party in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

7

26. This representation was inaccurate and the Seller Parties breached this warranty because the Article III representations and warranties contain untrue statements (as set forth above) and omit material facts necessary to make the statements in Article III, in light of the circumstances in which they are made, not misleading. Specifically, the Article III statements omitted the material facts that the Invention never worked and the Business never made any railroad ties using the Invention or the related process.

27. Article V of the APA set forth several covenants by the parties. In particular, the Seller Parties promised in § 5.04 to deliver to Buyer on the Closing Date all documentary materials relating to the Business (with emphasis added):

> On the Closing Date, the Seller Parties will deliver or cause to be delivered to Buyer all original (and any and all copies of) *agreements, documents, and books and records* and all computer disks, records or tapes or any other storage medium on which agreements, documents, books and records, files *and other information relating to the Business, the Purchased Assets* or the Assumed Liabilities are stored, in each case, that are in the possession or under the control of the Seller Parties. . . .

28. The Seller Parties did not fulfill this covenant because they did *not* deliver all such required materials and other information to Buyer at Closing. Specifically, the Seller Parties did not deliver to NICE Glass the information and know-how needed to use the Invention and operate the Business, including with respect to the use of waste or "basement" glass and silane as a binding in the Invention.

29. In § 5.05 of the APA, the Seller Parties further promised to promptly notify the Buyer of certain matters (with emphasis added):

> The Seller Parties shall give prompt written notice to Buyer of: (a) *the occurrence or non-occurrence of any event, change, circumstance, occurrence, effect or state of facts where the occurrence or nonoccurrence of such event*, change, circumstance, occurrence, effect or state of facts *would render any representation or warranty of a Seller Party*, if made on or immediately following the date of such event, *untrue or inaccurate*; (b) the *occurrence of any change, condition or event that has had or is*

*reasonably likely to have a material adverse effect on the Business, Purchased Assets, or Assumed Liabilities*; (c) *any failure of a Seller Party to comply with or satisfy any covenant or agreement* to be complied with or satisfied by it hereunder or any event or condition that would otherwise result in the nonfulfillment of any of the conditions to Buyer's obligations hereunder; (d) any notice or other communication from any person or entity alleging that the consent of such person or entity is or may be required in connection with the consummation of the transactions contemplated hereby; or (e) any Action pending or, to Seller's knowledge, threatened against a party or the parties relating to the transactions contemplated hereby.

30. The Seller Parties did not fulfill this covenant because they did not supply NICE Glass with prompt notice of required matters, including all problems with the Invention or related process or the fact that the Invention never worked and that the Business never made any Railroad Ties using the Invention or the related processes.

31. As partial consideration for the sale of the assets, the parties agreed in § 1.04(c) of the APA to "Royalty Payments" by NICE Glass. The royalty structure in § 1.04(c) provides for an Annual Royalty of $300,000 each year plus additional royalty payments based upon the volume of sales of railroad ties or related products.

32. The royalty structure assumes NICE Glass can actually use the Invention to make Railroad Ties and related products and royalties are not triggered unless NICE Glass can use the Invention and operate the Business.

33. Further, under § 1.04(c)(v) of the APA, NICE Glass's obligation to make any royalty payment ceases as follows:

> immediately upon Seller's or Equity Holders' failure to cure within sixty (60) days' notice by Buyer of any of the following: (1) fraud (which for the purposes to this **subpart (iv)** shall mean intentional deception, misappropriation of resources, or the manipulation of data to the advantage or disadvantage of a person or entity, (2) failure to comply with the terms of that certain Non-Competition and Non-Solicitation agreement of even date herewith; or (3) material failure to adhere to any of Buyer's internal policies and procedures applicable to independent contractors, licensees, or similarly-situated individuals.

34. NICE Glass's obligations to make royalty payments has ceased because the Seller Parties have not cured their intentional deception or manipulation of data to the disadvantage of NICE Glass.

35. In particular, the Seller Parties (specifically, CFH and the Colls) engaged in intentional deception most directly when they represented to NICE Glass, specifically Tim Noonan, in the APA on June 16, 2017 that CFH:

    (a) had invented a process for converting glass waste such as but not limited to basement cullet, rovings, veil and mat and plastic waste materials into structural reinforced plastics, when the Seller Parties knew that that was not the case;

    (b) was engaged in the business of manufacturing, selling, and distributing products used in the composite reinforcement industry, including but not limited to railroad ties, in each case created using a composite blend of recycled plastic and glass waste that incorporates, is based on, or is related to the Invention, when the Seller Parties knew that that was not the case; and

    (c) represented that the railroad ties the CFH had manufactured, tested, and sold were made using the Invention when in fact these ties were not made using the Invention.

36. When Defendants represented these facts to NICE Glass in the APA, Defendants knew the representations were false or inaccurate.

37. NICE Glass did not know the representations were false or inaccurate.

38. Defendants intended for NICE Glass to rely on the representations and NICE Glass did so rely.

39. In addition, Defendants "misappropriated resources" within the meaning of § 1.04(c)(v) when they refused to remit to NICE Glass the $70,000 prepayment under the Nortrak Contract.

40. In addition, the Seller Parties engaged in manipulation of data most directly when they provided materials at Closing, including a schematic for processing "basement glass" and certain testing results, that the Seller Parties represented set forth, explained, and otherwise documented the entire process for using the Invention in the Business, but those materials did not actually do so and in fact misrepresented the ability of the process set forth therein to achieve the object of the Invention.

41. On or about June 27, 2018, NICE Glass sent a letter to the Seller Parties giving notice of NICE Glass's termination of its obligations under § 1.04(c) of the APA (with respect to royalties).

**NICE Glass's Indemnification Rights under the APA**

42. In § 6.02 of the APA, the Seller Parties promised to indemnify Buyer as follows:

**Indemnification By Seller Parties.** The Seller Parties shall jointly and severally defend, indemnify and hold harmless Buyer, its affiliates and their respective stockholders, directors, officers and employees from and against all claims, judgments, damages, liabilities, settlements, losses, costs and expenses, including attorneys' fees and disbursements (collectively, "*Losses*"), arising from or relating to:

    (a) any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement or any document to be delivered hereunder;

    (b) any breach or non-fulfillment of any covenant, agreement or obligation to be performed by a Seller Party pursuant to this Agreement or any document to be delivered hereunder . . . .

43. The definition of "Losses" under § 6.02 of the APA includes attorneys' fees.

44. Section 6.06 of the APA is a "pro-sandbagging" provision, which makes irrelevant, for purposes of indemnification claims, any knowledge that NICE Glass has or may have obtained of CFH, including during any investigation of the company. Specifically:

> **Effect of Investigation.** Buyer's right to indemnification or other remedy based on the representations, warranties, covenants and agreements of Seller contained herein will not be affected by any investigation conducted by Buyer with respect to, or any knowledge acquired by Buyer at any time, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant or agreement.

45. Such provisions are common in commercial contracts of this kind and provide further assurances to the buyer that the representations, warranties, and covenants made in the agreement are accurate and that the buyer may recover losses incurred if they are otherwise.

46. Section 6.04(a) of the APA requires NICE Glass to give advanced written notice of Losses and to attempt in good faith to resolve all disputes before filing suit for indemnification.

47. NICE Glass has satisfied all pre-suit requirements of indemnification under the APA.

48. During pre-suit negotiations among the parties, NICE Glass expressly tendered a full rescission of the APA and the Agreements, which Defendants rejected.

### COUNT I – BREACH OF CONTRACT (the APA)
(Against CFH and the Colls)

49. NICE Glass restates and incorporates by reference the allegations in all prior paragraphs as if set forth fully herein.

50. NICE Glass entered into a valid contract with the Seller Parties—the APA.

51. The APA is supported by consideration and mutuality of obligation among the parties.

52. NICE Glass has complied with all of its duties and obligations under the APA and no condition precedent for recovery exists or remains unfulfilled.

53. The Seller Parties have breached various warranties and covenants under the APA, as specified in detail above.

54. Multiple representations that the Seller Parties made in the APA are inaccurate.

55. The Seller Parties' breaches of warranties and covenants the APA and inaccuracies in representations therein are material.

56. NICE Glass has been damaged by the Seller Parties' material breaches of the APA.

57. As a direct and proximate result of the Seller Parties' material breaches, NICE Glass has suffered and continues to suffer substantial damages in an amount in excess of $25,000.00, to be more fully determined at trial.

58. NICE Glass is entitled to compensatory damages for the Seller Parties' breaches of the APA.

59. Alternatively, as a result of the Seller Parties' material breaches of the APA, NICE Glass is entitled to rescind the APA and the Agreements and is entitled to restitution of all amounts paid to the Seller Parties thereunder.

WHEREFORE Plaintiff NICE Glass respectfully requests that this Court enter judgment in its favor and against the Seller Parties: (1) in an amount that exceeds $25,000 to be more fully proven at trial, the costs of this action, attorneys' fees (including as permitted by the APA), pre-judgment interest, and post-judgment interest; (2) alternatively, for rescission of the APA and the Agreements and for restitution of all amounts paid to the Seller Parties thereunder; and (3) for such other and further relief as this Honorable Court deems fair and just in the premises.

## COUNT II – DECLARATORY JUDGMENT (Royalty Payments under the APA)
(Against CFH and the Colls)

60. NICE Glass restates and incorporates by reference the allegations in all prior paragraphs as if set forth fully herein.

61. This Court, "in a case of actual controversy within its jurisdiction," has authority to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

62. NICE Glass is an interested party, has a legally protectable interest at stake in this dispute, and thus has standing to obtain a declaration of the rights, status, and legal relations of the parties, specifically with regard to any obligation to pay royalties under § 1.04(c) of the APA.

63. Under § 1.04(c)(v) of the APA, any obligation of NICE Glass to pay royalties terminates "immediately upon Seller's or Equity Holders' failure to cure within sixty (60) days' notice by Buyer of any of the following: (1) fraud (which for the purposes to this **subpart iv** shall mean intentional deception, misappropriation or resources, or the manipulation of data to the advantage or disadvantage of a person or entity . . . ."

64. As explained above, the Seller Parties have not cured their "fraud," as defined in the APA.

65. In addition, under § 1.04(c) of the APA, the term "Railroad Tie" is defined as a "standard tie railroad tie that is produced using, in any manner whatsoever, the Invention," and the royalty payments are premised upon NICE Glass's use of the Invention to make such Railroad Ties.

66. The Invention does not work, and NICE Glass is not using the Invention to make Railroad Ties.

67. For these and other reasons, NICE Glass has no obligation to pay royalties under § 1.04 of the APA.

68. NICE Glass has given notice to CFH that it has no such continuing obligation to pay royalties and that NICE Glass is formally terminating its royalty obligation.

69. CFH disagrees with NICE Glass's position on royalties, as CFH has made clear in written communications with NICE Glass, specifically in a July 9, 2018 correspondence, in which counsel for CFH stated as follows:

   a. "There is no basis for Buyer's unilateral termination and such termination constitutes a breach of non-fulfillment of a 'covenant, agreement or obligation to be performed by buyer' under Section 6.03(b). Therefore, this letter provided notice of Losses and claims for indemnification based upon Buyer's termination of its payment obligations described above."

   b. "Further, Buyer's Notice of Termination and Indemnification also states that buyer is/will withhold and set-off any Royalty Payments under Section 1.05, 6.02 and 6.04 of the Agreement. Because such withholding and/or set-off is improperly based upon Buyer's termination breach described above, this letter also provides notice of Losses and claims for indemnification based upon buyer's withholding and/or set-off of Royalty Payments due to Seller."

70. The Seller Parties' ongoing violations of NICE Glass's rights, and the dispute between NICE Glass and CFH regarding whether such violations serve to terminate any obligation to pay royalties under § 1.04 of the APA present a real, substantial, and presently-existing justiciable controversy ripe for judicial resolution through declaratory judgment.

71. Declaring the parties' rights and obligations with respect to royalties under the APA will be of immense practical convenience to the parties, will terminate uncertainty regarding NICE Glass's royalty obligation, will assist NICE Glass to decide whether or not to pay royalties under the APA going forward, and will avoid serial lawsuits each year as CFH claims that royalty payments become due.

72. NICE Glass's rights and interests to be protected are substantial.

WHEREFORE, Plaintiff NICE Glass respectfully requests that the Court enter a declaratory judgment in his favor and against the Seller Parties as follows:

    a. finding and decreeing that the Seller Parties have committed "fraud" as defined under Section 1.04(c)(v)(1);

    b. finding and decreeing that that NICE Glass has no obligation to pay CFH royalties under the § 1.04 of APA if NICE Glass cannot use the purchased Invention to create Railroad Ties;

    c. finding and decreeing that NICE Glass has no obligation to pay royalties under § 1.04 of the APA;

    d. awarding NICE Glass the costs of this action, including attorneys' fees (as permitted by the APA), pre-judgment interest, post-judgment interest; and

    e. granting for such other and further relief as this Honorable Court deems fair and just in the premises.

Dated: <u>November 9, 2018</u>

    Respectfully submitted,

    POLSINELLI PC

    By: <u>/s/James P. Martin</u>
        JAMES P. MARTIN (#50170)
        100 S. Fourth Street, Suite 1000
        St. Louis, MO 63102
        314.889.8000
        Fax No: 314.231.1776
        jmartin@polsinelli.com

    ATTORNEYS FOR PLAINTIFF
    NICE GLASS LLC

**CERTIFICATE OF SERVICE**

      I hereby certify that on **November 9, 2018**, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, by which notification of such filing was electronically sent and served to all parties of record, which includes the following:

Thomas W. Hayde, Jr.
SPENCER FANE LLP
1 North Brentwood Blvd., Suite 1000
St. Louis, MO 63105
(314) 863-7733
Fax No: (314) 862-4656
thayde@spencerfane.com

Maria C. Mariano Guthrie (*pro hac vice*)
Jeffrey J. Patter (*pro hac vice*)
CARLILE PATCHEN & MURPHY LLP
366 E. Broad Street
Columbus, Ohio 43215
(614) 628-0768
Fax No: (614) 221-0216
mguthrie@cpmlaw.com
jpatter@cpmlaw.com

ATTORNEYS FOR DEFENDANTS
COLL FINANCIAL HOLDINGS, LLC,
BRIAN COLL, and RENEE COLL

                                                        /s/James P. Martin

17
090678/572271-66017203.4